STATE

v.

Francis L. FEROLA, Jr.

No. 85–146–C.A.

Supreme Court of Rhode Island.

Dec. 19, 1986.

Arlene Violet, Atty. Gen., Thomas Dickinson, Annie Goldberg, Spec. Asst. Attys. Gen., for plaintiff

William F. Reilly, Public Defender, Barbara Hurst, Asst. Public Defender, for defendant

## OPINION

SHEA, Judge.

The defendant, Francis Ferola (Ferola), appeals from his conviction in Superior Court of murder in the first degree and sexual assault in the first degree. We affirm.

Evidence presented at trial revealed that on October 14, 1982, two neighbors of the seventy-two-year old Warwick victim found her dead on the floor of her bedroom, her body partially unclothed and wrapped in a sheet. Her wrists had been tied behind her with a shirt; her feet were bound together by a bedsheet attached to the bed; a blouse was stuffed in her mouth and knotted behind her head. A nylon stocking was later found deep in her throat. An autopsy revealed a large bruise on the back of the victim's head and fractures and bleeding around the larynx. She had choked to death. A vaginal examination determining that sexual intercourse had occurred revealed bruising, tearing, and the presence of spermatozoa at least twelve to twenty-four hours old.

Ferola, aged twenty-four, lived with his family on Ormsby Street in Warwick, just three houses from the home of the victim. On the evening of October 14, 1982, Ferola,

in response to a Warwick police request, came to the Warwick police station to be questioned about the death of the Warwick victim. He signed a waiver-of-constitutional-rights form at that time. Ferola admitted that he had known the victim and that he had recently been in her home, drinking a beer and watching a baseball game on television.

A week after the Warwick investigation began, Ferola retained an attorney and thereafter resisted attempts by Warwick detectives to question him, saying that he knew his rights and that he knew he was not obliged to talk to them.

One year and two days after the Warwick victim was found dead, on October 16, 1983, the body of a young woman was discovered in East Providence in a homicide whose characteristics bore similarities to the Warwick crime. The East Providence victim's hands were tied behind her back and she was gagged by means of a blouse stuffed in her mouth and knotted behind her head. Also, she had known defendant, Francis Ferola. In addition, there was evidence of the 1980 rape of another East Providence woman in which Ferola was the named assailant, which bore a similarity to the Warwick and East Providence homicides.

East Providence police began questioning Ferola about the East Providence death after they had met with members of the Warwick police department. East Providence police knew that the Warwick department suspected Ferola in the East Providence murder case and had questioned him. East Providence police confronted Ferola in West Warwick on October 16, 1983. Ferola was read his rights and then asked if he was willing to come back to the East Providence police station for questioning. Ferola agreed and, upon his request, was transported to the East Providence station for questioning. There Ferola, after having again been read his

constitutional rights, stated that he understood them and then signed a standard rights-waiver form. Ferola then gave a lengthy exculpatory statement explaining his whereabouts during the evening of the Warwick murder.

Two days later, on October 18, 1983, again Ferola agreed, on the request of East Providence police, to submit to further questioning. Again, he signed a rights-waiver form. He also signed a consent-to-search form and agreed to let the police take a palm print.

During the questioning of Ferola with regard to the East Providence murder, the rape case in East Providence was presented to a Providence County grand jury. On Friday, October 28, 1983, a secret indictment was returned charging Ferola with first-degree sexual assault and assault with a dangerous weapon. A warrant for Ferola's arrest was issued the same day. However, East Providence police decided not to arrest Ferola on the rape warrant but to continue soliciting Ferola's cooperation in the East Providence murder investigation.[1] Consequently, on October 28, 1983, Ferola received a call at approximately 4 p.m. from the East Providence police requesting him to come to the station for further questioning in regard to the homicide which they were investigating. Ferola said that as he had an appointment, he would not be in until 7 p.m. Even though the appointment he referred to had been canceled, he drove to the station at approximately 7 p.m.

Upon his arrival at the police station, Ferola was informed that because of inconsistencies in his statement of October 16, 1983, further questioning was necessary. As on prior occasions, Ferola was read his constitutional rights, and once again, he signed a rights-waiver form that informed him that he was a suspect in the crime of murder. He did not indicate that he want-

---

1. We acknowledge that had the East Providence police department informed defendant that he was in custody, the existence of the warrant would have justified their holding him. But in this case the police, for investigative purposes, deferred execution of the warrant and never informed defendant of its existence, which they were not required to do in this instance.

ed a lawyer, and according to the police, he was cooperative and calm. From 7:15 to 11:15 p.m., Ferola was questioned in four or five periods of approximately thirty minutes each by two detectives at a time, with a break between sessions of approximately fifteen minutes each. At 11:15 p.m. Ferola broke down and cried for several minutes. He then composed himself and recounted the events that ended in the death of the East Providence woman.[2] After reciting that confession, Ferola and the other detectives sat in the main area of the detective division and had hamburgers and soda. Ferola's oral confession was then reduced to writing. At approximately 3:30 a.m. the detectives set up a cot for Ferola in the middle of the detective division where he then slept even though he was restless.[3]

On Saturday morning Ferola was transported to the lockup at the Providence police station sometime between 8 and 9 a.m. East Providence police advised the Warwick detective division that Ferola had confessed to being responsible for the East Providence murder and that he was in custody in Providence.

Between 10 and 10:30 a.m. on Saturday morning, Warwick police arrived at the Providence police station with the intention of obtaining a statement from Ferola about the Warwick homicide. Shortly before noon, two Warwick detectives met with Ferola in an office made available to them by the Providence police. The time between their arrival in Providence and their actual questioning was spent preparing themselves to question Ferola.

When Ferola was brought upstairs from the lockup to the interview room, he was informed of his rights. The defendant appeared tired but not exhausted and, unlike his demeanor on prior occasions, he appeared to the detectives not to be "combative" but rather "relieved." He signed a rights-waiver form. Then one Warwick detective asked "Frank, do you know why we're here?" Ferola then began to cry and stated, "I didn't mean to kill her. I liked her. I didn't mean to kill her."

Ferola wept for several minutes. He then gave a statement admitting that he had struck the Warwick victim in the center of her face with his left hand, causing her to fall from her chair and hit her head. He dragged her into the bedroom, tied her hands, and put a sock in her mouth and gagged her. He said that he tried to make the incident look like a robbery. Ferola made no reference to sexual assault in his confession.

The oral statement was reduced to writing. Ferola was given the written versions to look over, and as he read, he pointed out a spelling error. When he finished reading, he signed the statements, making no corrections. The entire session lasted approximately one hour. Ferola was then returned to the lockup.

On October 31, 1983—three days after his confession to the East Providence police and two days after his statement to the Warwick police—Ferola was arraigned on the East Providence murder. He was arraigned on the following day, November 1, 1983, on the Warwick homicide.

### A

### THE MOTION TO SUPPRESS

The heart of this appeal is Ferola's assertion that the trial justice erred by refusing to suppress his confession of October 29, 1983, to the Warwick police. He raises

---

**2.** Ferola was ultimately charged with the East Providence murder. On February 6, 1985, a judgment of conviction was entered and he was sentenced to life imprisonment, to run consecutively to the sentences imposed for the Warwick crimes. The East Providence conviction is also currently on appeal to this court.

**3.** East Providence police testified that they only had "makeshift" accommodations for detention because the building that housed the East Providence police department was destroyed by fire in 1976, leaving the department to share space in a municipal garage. As a result, the East Providence police normally transported suspects to Providence if they had to be held overnight. However, they decided to obtain a cot and have defendant sleep in the detective division under their supervision because of their fear that Ferola might harm himself after his confession.

three specific objections to the admission of the confession to the Warwick murder.

First, Ferola asserts that since there was no probable cause for his arrest at the East Providence police station on the evening of Friday, October 28, 1983, any statements he gave to the East Providence police and, later, to the Warwick police were the "tainted fruit" of an illegal arrest, basing his assertion on the exclusionary rule, U.S. Const. Amendment IV; R.I. Const. art. I, § 6. The motion was denied by the trial justice. We conclude that defendant's confessions to both the East Providence and the Warwick police were not the fruits of an illegal arrest.

To evaluate defendant's assertion that his confession resulted from illegal seizure or arrest, we must determine first whether he was "seized" when the statement was made and, if so, whether the seizure was supported by probable cause. *State v. Bailey*, 417 A.2d 915, 917 (R.I.1980).

One is "seized" within the meaning of the Fourth Amendment "if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Immigration and Naturalization Service v. Delgado*, 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247, 255 (1984) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 509 (1980)).

Ferola makes much of the fact that the supervising detective in East Providence testified that when Ferola walked into the station, he was not free to leave. The trial justice found that because Ferola was not actually free to leave the station and was continually questioned by the East Providence police, he was under arrest. We disagree.

The following facts were not seriously in dispute: Ferola was questioned by the Warwick police regarding the Warwick homicide on four occasions. On the later two dates he refused to answer questions and was allowed to leave prior to October 28, 1983. On October 16, 1983, one year

after the Warwick murder and following the death of the East Providence woman, Ferola voluntarily came to the East Providence police station and gave a statement about his relationship with the East Providence victim and his whereabouts at the time of the murder. After signing a rights-waiver form and giving a lengthy exculpatory statement, he was allowed to leave. Two days later, on October 18, 1983, Ferola came into the East Providence police station again at police request. Again, Ferola signed a rights-waiver form and agreed to let police take a palm print. Moreover, he signed a consent-to-search form. Ferola reaffirmed the truth of his October 16 exculpatory statement, and he was allowed to leave.

In *State v. Bailey*, this court stated that in order to ascertain whether a person is arrested at a given time, we look to several factors: the extent to which the person's freedom is curtailed and the degree of force used by the police, the belief of a reasonable innocent person in the same circumstances, and whether the person had the option of not going with the police. 417 A.2d at 917–18.

In *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), federal drug agents approached the defendant as she was walking through an airport concourse, identified themselves, and asked to see her identification and airline ticket, which she produced for their inspection. Justice Stewart, in a plurality opinion joined by Justice Rehnquist, concluded that there had been no seizure, explaining that *"a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."* (Emphasis added.) 446 U.S. at 554, 100 S.Ct. at 1877, 64 L.Ed.2d at 509. Moreover, in a footnote, Justice Stewart explained that "the subjective intention of the DEA agent in this case to detain the respondent, had she attempted to leave, is irrelevant except

insofar as that may have been conveyed to the respondent." *Id.* at 554 n. 6, 100 S.Ct. at 1877 n. 6, 64 L.Ed.2d at 509 n. 6. Similarly, we find that the subjective intentions of the East Providence police to detain Ferola were irrelevant except insofar as they were communicated to defendant. The record reveals no such communication to Ferola.

It is significant that Ferola had answered questions and then left the East Providence police station on two occasions within two weeks prior to October 28, 1983. Moreover, Ferola came to the station in his own car. He was not told that he was under arrest or that he was not free to go. In addition, although it is clear that the questioning by the East Providence police was of a persistent nature, the evidence does not convince this court that Ferola's continued presence at the police station was the result of any coercion on the part of the police. Ferola chose to remain at the station and answer questions. On these facts, Ferola did not have reason to believe his liberty would be restricted. *Compare Florida v. Royer,* 460 U.S. 491, 503, 103 S.Ct. 1319, 1327, 75 L.Ed.2d 229, 240 (1983) (police had Royer's ticket and identification and had seized his luggage, and at least as of the moment he went with them to be questioned, "any consensual aspects of the encounter had evaporated") *with Delgado,* 466 U.S. at 216, 104 S.Ct. at 1763, 80 L.Ed.2d at 255 (the fact that people respond to a police request, without being told they are free not to respond, "hardly eliminates the consensual nature of the response").

Even though it is true that an initially consensual encounter "can be transformed into a seizure or detention within the meaning of the Fourth Amendment 'if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave' " *Delgado,* 466 U.S. at 215, 104 S.Ct. at 1762,

80 L.Ed.2d at 255 (quoting *United States v. Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877, 64 L.Ed.2d at 509), none of the evidence presented demonstrates that Ferola's voluntary entry into the East Providence police station at approximately 7:15 p.m. was later that evening transformed into an arrest prior to his confession. In view of his other recent meetings with the East Providence police as well as his four meetings with the Warwick police, it is not unreasonable to conclude that Ferola continued to believe that he was free to leave. Accordingly, we find that Ferola's liberty was not so curtailed as to constitute an arrest. Therefore, a probable-cause determination was not required.[4]

The second of Ferola's claims is based on his contention that the statement he gave to the Warwick detectives at the Providence police station on Saturday morning should have been suppressed because of the time lapse between his arrest on Friday evening and his appearance for arraignment purposes before a District Court justice. Rule 5(a) of the Superior Court Rules of Criminal Procedure provides that an officer making an arrest pursuant to a warrant shall take the arrested person "without unnecessary delay before a judge of the District Court."

This rule was before the court in *State v. Cobb,* 494 A.2d 1182 (R.I.1985), where we emphasized that if delay was to render a confession inadmissible, the delay must have been operative at the time the confession was made. *Id.* at 1185; *State v. Johnson,* 119 R.I. 749, 756, 383 A.2d 1012, 1017 (1978). Applying that point to the case before us, we must consider whether "the so-called delay in bringing the defendant before a judicial officer in any way prompted [Ferola] to give the police" his inculpatory statement. *Cobb,* 494 A.2d at 1185.

The evidence at the suppression hearing established the following: Ferola voluntar-

---

**4.** The trial justice in this case found that Ferola was under arrest supported by probable cause. Therefore, the result is unaffected.

ily came to the East Providence police station on Friday evening upon police request. After several hours of questioning, Ferola gave the confession to the East Providence police, which confession was reduced to writing. Ferola then slept somewhat restlessly in the detective division under the observation of the officers.

On Saturday morning Ferola was transported to the lockup at the Providence police station sometime between 8 and 9 a.m. Shortly before noon, two Warwick detectives met with Ferola, and almost immediately, he confessed to the murder of the Warwick woman.

 Ferola argues that the delay between his arrest and the time of his arraignment three days later on the East Providence murder was clearly unnecessary. We are of the opinion, as was the trial justice, that the East Providence police acted reasonably by setting up a cot on which Ferola could sleep in the late hours of Saturday night rather than take him directly to a justice of the peace to be arraigned at that late hour. That leaves the delay between approximately 9 a.m. and noon on Saturday, during which time Ferola was in the lockup at the Providence police station. We find no convincing evidence that this span of approximately three hours amounted to such an unnecessary delay "as to affect the admissibility of [Ferola's] confessions." *State v. Johnson*, 119 R.I. at 756, 383 A.2d at 1017.

We strongly endorse the prompt-presentment standard of Rule 5(a), which seeks, among other things, to remove a defendant from the coercive atmosphere of the police station to an open court before a neutral judge. And, although it is true that Ferola could have been arraigned during the late hours of Friday night or anytime Saturday morning prior to his meeting with the Warwick police, we do not find any evidence that this delay "in bringing the defendant before a judicial officer prompted [Ferola] to give the police" his inculpatory statement. *State v. Cobb*, 494 A.2d at 1185. In our opinion, there is also little merit in defendant's assertion that it was "clearly wrong" for the trial justice to consider the

Rule 5(a) claim in the context of "voluntariness." The trial justice did consider the fundamental question of whether the length of time preceding Ferola's statement had any "causative effect upon his * * * decision to confess." *State v. Johnson*, 119 R.I. at 757, 383 A.2d at 1017. We find that the trial justice did not commit reversible error in refusing to suppress Ferola's second confession because of any violation of Rule 5(a).

The third issue involves claims that the state failed to prove that Ferola's waiver of his *Miranda* rights and subsequent confessions were knowing, voluntary, and intelligent under U.S. Const. Amend. V and R.I. Const. art. I, § 13.

 When a defendant challenges the voluntariness of a statement or confession, the trial justice must conduct a preliminary hearing outside the presence of the jury. The confession is admissible if an examination of the totality of the circumstances surrounding the interrogation shows, by clear and convincing evidence, that the defendant voluntarily waived his right to remain silent and have the assistance of counsel. *State v. Verlaque*, 465 A.2d 207, 209–10 (R.I.1983). If the trial justice finds the confession admissible, he must then instruct the jury to make an independent assessment of its voluntariness. *Id.* at 210. On review this court looks at the record to determine whether the trial justice correctly followed these procedural safeguards. If he did, we then examine the record and order reversal only if we conclude that the decision of the trial justice was clearly wrong. *Id.* Here the trial justice correctly observed the procedural safeguards; therefore, we shall independently examine the record only to determine if his decision was clearly wrong.

Ferola was questioned by the East Providence police on Friday night and again by the Warwick police on Saturday shortly before noon. The trial justice found that with regard to each of these occasions the state had met its obligation to prove, by clear and convincing evidence, (1) that Ferola had been informed of his constitutional rights under *Miranda v. Arizona*, 384 U.S.

436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); (2) that he understood these rights and had knowingly, intelligently, and voluntarily waived them; and (3) that he thereafter made a voluntary statement. Our examination of the record persuades us that the trial justice was correct when he concluded that Ferola's confession was voluntary.

Ferola correctly asserts that the confession that he gave to the Warwick police on Saturday, October 29, 1983, must be viewed in light of the circumstances attendant to the East Providence confession the night before. He argues that the persistent questioning by the East Providence police had so broken down his resistance that the resolve to remain silent he had demonstrated to the Warwick police had simply crumbled. The record does not support him.

The evidence established that Ferola had been informed of his constitutional rights on Friday night by the East Providence police after he voluntarily drove himself to the police station. He chose to waive those rights. Later that night, he gave his incriminating statements to the East Providence police. Ferola was transported to the Providence police station the next morning and met with the Warwick police shortly before noon. Before he confessed to having caused the murder of his neighbor, he was advised again of his *Miranda* rights. It is also important to note that Ferola previously had been advised of his *Miranda* rights by the Warwick police on four separate occasions. On each of these prior occasions Ferola invoked his right to remain silent and on at least two occasions he had specifically insisted on speaking with his attorney first.[5] Ferola's "prior involvement" in the criminal justice system is "telling evidence, in our opinion, that the constitutional warnings given him by the [police] were understood and that the waiver was knowingly and intelligently

made." *State v. Crowhurst,* 470 A.2d 1138, 1143 (R.I.1984).

Ferola's claim that by Saturday morning he had been so weakened by continual questioning and lack of sleep that he was incapable of volition is not supported by the evidence. Ferola was given opportunities to relax at approximately half-hour intervals. Although he may have been tired from the questioning the night before, there is no evidence that he was so overcome by fatigue or stress as to prevent a voluntary waiver. Finally, Ferola's claim that he was too emotionally upset to be rational is not credible. Even though there was evidence that he wept upon giving each confession, we are convinced that his tears are not indicative of an overborne will. Rather, the tears more likely indicated relief, "remorse, embarrassment, and possibly revulsion at the viciousness of the murder." *State v. Verlaque,* 465 A.2d at 210. Accordingly, we affirm the finding of the trial justice that Ferola freely, voluntarily, and intelligently waived his right against self-incrimination before giving his statement to the Warwick police in the Providence police station.

### B

### THE TESTIMONY OF THE MEDICAL EXAMINER

Finally Ferola asserts that the conviction of first-degree sexual assault cannot stand because the medical examiner who performed the autopsy did not speak in terms of "strong probability." Without the medical examiner's testimony, defendant argues, the evidence was not sufficient to warrant submission of the count to the jury.

The evidence in the case established, without question, that the Warwick victim was sexually assaulted, that penetration had occurred, and that it was accomplished by force. It is not disputed that the evidence from other witnesses as well as the

---

5. The defendant did not assert that his Sixth Amendment right to counsel was violated under *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), either in his brief or during oral argument. Accordingly, we do not reach that question here. Had he asserted this argument, it is doubtful he would have prevailed. *Edwards* involved a defendant in custody, and Ferola concedes in his brief that he was not in custody on the occasions when he requested an attorney. Also, although Ferola gave the name of an attorney to the Warwick police, that attorney later told the Warwick police he no longer represented Ferola.

observations of the medical examiner were properly admitted. The victim was found, bound hand and foot, twice gagged, her face and body bruised, her ribs were fractured, and her brassiere, stained with blood, removed. Her panties had been ripped away at the crotch and were shoved up above her waist. The tissues of the vagina were bruised and torn, and there were sperm in the vagina. This mass of evidence alone warranted the conclusion by the jury that first-degree sexual assault had occurred.

The state medical examiner who performed the autopsy of the victim was qualified as an expert in forensic pathology without objection by defendant. However, Ferola maintains that the medical examiner should not have been permitted to state his opinion that the victim's vaginal injuries were "consistent with" force because the opinion itself has probative value only if it speaks in terms of probability or strong probability.

The record reveals that the trial justice asked the medical examiner the following question to which the defense objected:

> "The Court: Doctor, do you have an opinion based on your training and the examination of the body, to a reasonable degree of medical certainty, as to whether or not your findings to the bruises in the vaginal area are consistent with forced sexual intercourse?"

At this juncture a side-bar conference was held during which defense counsel asserted that under *State v. Adams*, 481 A.2d 718, 727 (R.I.1984), there was nothing in the medical examiner's background to suggest he was "an expert in gynecology or an expert in the elements of first degree sexual assault." In short, defendant's counsel at trial objected specifically to the medical examiner's qualifications.

█ Appellate counsel now asserts that the wording of the medical examiner's opinion failed to speak in terms of probability, and only used the phrase "consistent with." Our examination of the record, however, indicates that Ferola's trial counsel made no objection to the phrase "consistent with." We will not review objections to evidence when those objections were not raised at trial. *State v. Dionne*, 442 A.2d 876, 886 (R.I.1982); *State v. Duggan*, 414 A.2d 788, 791 (R.I.1980). Consequently, this specific issue is not before us on appeal. However, the physician's testimony certainly was admissible, even though by itself it would not have established that a sexual assault had occurred. That testimony constituted one portion of a mass of compelling evidence which excluded all reasonable doubt of the brutal assault and murder which had been perpetrated upon the elderly victim.

For the reasons stated, the defendant's appeal is denied and dismissed, the judgments of conviction appealed from are affirmed, and the papers in the case are remanded to the Superior Court.